UNITED STATES BANKRUPTCY COURT
DISTRICT OF COLORADO

| | |
|---|---|
| In re<br><br>MOUNTAIN CITY MEAT CO., INC.<br><br>Debtor. | Case No. 11-32656<br>Chapter 11 |

### DECLARATION OF ALEX G. SMITH IN SUPPORT OF
### CHAPTER 11 PETITION AND FIRST DAY PLEADINGS

Alex G. Smith, being first duly sworn, upon his oath and under penalty of perjury states:

1.  I am a management consultant and employee of BGA Management, LLC d/b/a Alliance Management. I am authorized to submit this Declaration in support of the Chapter 11 Petition of Mountain City Meat Co., Inc. (the "Debtor") and the first day pleadings described herein.

2.  I am familiar with the day-to-day operations, business affairs, and books and records of the Debtor. I have also reviewed the Debtor's "First Day Motions and Orders" and am familiar with the facts alleged therein and the relief requested. I have personal knowledge of the facts, circumstances and other matters set forth in the First Day Motions and Proposed Orders and in this Declaration. If called as a witness, I would testify thereto and as follows:

### I. BACKGROUND

3.  On September 24, 2011 (the "Petition Date"), the Debtor filed its voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101, et seq. (the "Bankruptcy Code").

4.  The Debtor is a Colorado corporation and is one of the largest portion control beef processors in the United States. Through its headquarters in Denver, Colorado and its second manufacturing facility in Nashville, Tennessee, the Debtor supplies high quality ground beef and portion control steak cuts through several channels, including retail stores, chain restaurants and broadline food service distributors.

5.  Prior to the Petition Date, on August 9, 2011, the Debtor's board of directors (the "Board") appointed BGA Management, LLC d/b/a Alliance Management, through its agent, Alex G. Smith ("Alliance") as Chief Restructuring Officer ("CRO") of the Debtor until the need for a CRO no longer existed, as evidenced by that certain Memorandum of Action of the Board of Directors of Mountain City Meat Co., Inc., dated August 11, 2011 (the "Initial Board Resolution").

6.  Immediately after appointing Alliance as CRO, the Board resigned.

7. Two days later, on August 11, 2011, the Debtor's secured lender, Fifth Third Bank (the "Secured Lender") commenced an action against the Debtor in the Denver District Court, Case No. 2011CV5635, seeking, among other things, the appointment of Alliance as receiver for substantially all of the Debtor's assets and to operate the Debtor's business and prepare the company for sale.

8. At 5:00 p.m. that same day, the Denver District Court entered its Stipulated Order for Forthwith Appointment of Receiver (the "Receivership Order") appointing Alliance as receiver for the Debtor's personal property and related operations.

9. However, just minutes earlier, certain putative unsecured creditors of the Debtor initiated an involuntary petition under chapter 7 of the Bankruptcy Code, commencing case number 11-29209-HRT (the "Involuntary Case"), which the Debtor is currently contesting.

10. In the Involuntary Case, the Secured Lender obtained two interim orders, (the "Interim Orders," Dkt. ## 17 and 37), from the Court annulling the automatic stay so the receiver could "continue exercising and complying with the rights, privileges and obligations granted to it pursuant to the Receivership Order."

11. Prior to entering the first Interim Order, the Court in the Involuntary Case held a hearing to determine whether the automatic stay should be annulled so that Alliance could act as receiver. At the hearing neither the Secured Lender nor Alliance was aware of the Initial Board Resolution and were, therefore, unaware that Alliance was not only appointed as the Debtor's CRO, but had broad authority to act on the Debtor's behalf, as outlined below.

12. On September 1, 2011, and as a result of the foregoing facts, members of the board executed that certain Memorandum of Board, dated September 1, 2011 (the "Clarification" and together with the Initial Board Resolution, the "Board Resolution").

13. Pursuant to the Clarification, the Board clarified its intent in passing the Initial Board Resolution. When it passed the Initial Board Resolution, the Board did not anticipate that the Involuntary Case would be filed prior to the entry of the Receivership Order or that there would be a continuing need for a CRO. To remedy any misunderstanding, members of the board executed the Clarification and reformed the Initial Board Resolution to reflect the true intent of the Board: that Alliance as CRO retain the broad authority granted to it by the Board unless and until such authority is later revoked or modified by the Board.

14. Under the Board Resolution, Alliance has broad authority to manage the operations of the Debtor, file a bankruptcy case on behalf of the Debtor, and act as the responsible officer during any bankruptcy proceeding. In particular, the Board Resolution grants Alliance the full and exclusive authority with respect to all of the Debtor's operations and decisions, including:

    a. Day to day operational and financial management of the Debtor;

    b. Analysis of strategic operations for the Debtor, including overseeing the preparation of a wind down plan, and pursuing any strategic option or mechanism that the CRO determines to be appropriate for the Debtor;

      c.    Hiring and discharging employees, professionals or third party service providers;

      d.    Managing and, if the CRO determines appropriate, concluding a sale process for the Debtor and any or all of its assets, including directing communications with prospective purchasers of the Debtor's assets, negotiating the terms of the purchase and sale documentation and taking any steps necessary or appropriate to conclude any sale transactions; and

      e.    Commencing a bankruptcy or other insolvency proceeding for the Debtor and causing the Debtor to take any actions which the CRO deems necessary or appropriate in connection with such proceeding, including, without limitation, negotiating, approving and executing on behalf of the Debtor documentation relating to debtor in possession financing, asset sales pursuant to Bankruptcy Code § 363, the retention of professionals and the proposal of a plan of liquidation or reorganization.

15.    On September 2, 2011, the Debtor and Alliance entered into a Professional Services Agreement, amending and restating the original Consulting Agreement executed by the parties on August 10, 2011 (the "CRO Agreement").

16.    The Secured Lender asserts a first priority lien and security interest in all of the Debtor's personal property (the "Collateral"), including all of the Debtor's cash (the "Cash Collateral") pursuant to a Loan and Security Agreement the Debtor executed in favor of the Secured Lender, dated November 6, 2009, and as amended by the First Amendment to Loan and Security Agreement dated March 7, 2011 (the "Security Agreement"). The Security Agreement secures the payment of the Debtor's obligations under a Revolving Note in the amount of $20,000,000, dated November 6, 2009, as amended by the First Amended and Restated Revolving Note in the amount of $25,000,000, dated March 7, 2011 (the "Revolving Note"), and a Term Note in the amount of $4,000,000, dated November 6, 2009, as amended by the First Amended and Restated Term Note in the amount of $2,519,213, dated March 7, 2011 (the "Term Note" and together with the Security Agreement and the Revolving Note, the "Loan Documents"). The Secured Lender asserts that the Debtor is indebted to the Secured Lender under the Loan Documents in the amount of $17,773,541.47, consisting of principal and accrued interest as of August 11, 2011, and the Debtor has made payments to the Secured Lender in the amounts of $5,500,000.00, $2,000,000.00 and $1,050,000.00 since August 11, 2011.

## II. FIRST DAY MOTIONS

17.    This Declaration is filed in support of the factual allegations contained in the following motions, filed contemporaneously with this Declaration.

18.    The Debtor will suffer immediate and irreparable harm if the following motions are not granted, as described in more detail below.

A. **Motion for Entry of Consensual Order (I) Authorizing Use Cash Collateral, (II) Providing Adequate Protection and (III) Scheduling a Final Hearing (the "Cash Collateral Motion")**

19. Without use of the Cash Collateral,[1] the Debtor will suffer immediate and irreparable harm. If the Debtor is not permitted to use the Cash Collateral, the results would be fatal to this Chapter 11 case. The Debtor plans to sell substantially all of its assets within the first one to two months of this case, and has several motions pending to effectuate a sale and continue its operations until a sale. Without the use of the Cash Collateral, the Debtor would not be able to continue to negotiate with potential purchasers of its assets, close a sale within one to two months, or sell its current perishable inventory before it becomes commercially obsolete and has significantly less value. Alternatively, if the Debtor is able to use the Cash Collateral, it will be able to pay its ongoing business expenses which, in turn, will preserve and protect the Debtor's assets and assist the Debtor in its efforts to sell its assets, thereby maximizing the value of its estate. Thus, immediate use of the Cash Collateral is absolutely necessary at this stage in order to avoid immediate and irreparable harm.

20. A summary of the key terms of the Interim Cash Collateral Order are set forth in the Cash Collateral Motion.

B. **Emergency Motion for an Order Authorizing Sale of Perishable Meat Inventory and Approving Sale Procedures**

21. Although the goal in this Chapter 11 case is to sell the Debtor's business as a going concern, in the interim—and more specifically, within the weeks immediately following the Petition Date —the Debtor must continue to sell its existing inventory, consisting of finished portion control steaks and ground beef, raw material beef, additives and related packaging supplies (the "Inventory") in order to prevent a substantial loss to the estate. The Inventory had a book value of $6,818,601.00 as of September 22, 2011, and generally consists of perishable products and frozen pre-packaged meat products that must be used or sold to the consumer by a specific date. As the Inventory ages, it is at greater risk of becoming commercially obsolete, especially to retail stores, who must take into account the time the product remains on their shelves before it is sold to consumers. Thus, with each day the Inventory ages, the pool of potential purchasers shrinks.

22. The Debtor proposes to sell the Inventory according to the same procedures it has followed since the Receivership Order was entered. The proposed procedures (the "Inventory Sale Procedures") are as follows: The Debtor will continue to sell raw material and finished goods to its current customers at the rates the Debtor previously sold its meat inventory to such customers. However, if the current customers do not want to purchase the product, then the Debtor will sell the Inventory by either (a) discounting the Inventory for its existing customers if it is close to its expiration date, (b) selling the Inventory back to the Debtor's vendors for cash, (c) selling the Inventory through meat brokers, who will obtain the highest possible price for the Inventory, but require a commission upon completion of a sale or (d) selling the product to the

---

[1] All capitalized terms not otherwise defined herein shall have the same meaning as set forth in the Cash Collateral Motion.

public on an "as is" basis. The Debtor will employ any and all of these procedures, as needed, to obtain the best possible price for the Inventory. The Debtor will likely employ different methods for different portions of the Inventory, as some of the Inventory is more perishable and will need to be sold on a more expedited basis.

23. I believe that the Inventory Sale Procedures provide the best means of achieving the best possible return for the Inventory in an extremely short timeframe. The Inventory Sale Procedures will also permit me to focus on the sale of the Debtor's other assets as a going concern, and will lead to the highest recovery for the estate.

24. The proceeds from the sale of the Inventory will be used or held by the Debtor in accordance with orders entered by the Court approving the use of cash collateral.

25. The Inventory is of the same quality that the Debtor's customers demanded pre-petition. However, due to its perishable nature, it must be sold quickly or it will lose its value in the marketplace. In my opinion, the Inventory Sale Procedures take into account that the Inventory must be sold quickly, but that it needs to be sold in a manner that does not hinder a potential sale of the Debtor's business as a going concern or of its personal property.

**C.     Motion to Assume Engagement Agreement with Chief Restructuring Officer**

26. The CRO Agreement establishes the contractual obligations of the parties and explicitly outlines Alliance's authority. It confirms that Alliance will act as the Debtor's chief restructuring officer and will have primary authority with respect to the items outlined in the Board Resolution as well as the following tasks:

    a.     Provide day-to-day operational and financial management;

    b.     Sell and liquidate the Debtor's remaining assets;

    c.     With the assistance of the Debtor's bankruptcy counsel, if appropriate, prepare a liquidating plan of reorganization plan and a disclosure statement;

    d.     Prosecute and settle, as appropriate, the Debtor's various litigation claims and claim objections;

    e.     Manage the Debtor's remaining employees, as appropriate, including hiring and firing employees; and

    f.     Employ additional professionals, consultants, employees, and other persons as appropriate in assisting the CRO and/or the Debtor with operations and its efforts to sell its business as a going concern.

27. Alliance will be compensated for its services on an hourly basis and will be reimbursed for its out-of-pocket costs and reasonable expenses, including travel expenses, in accordance with the terms of the CRO Agreement. Alliance previously engaged Faegre & Benson LLP ("Faegre") to represent Alliance during the receivership and during this bankruptcy

case. The fees and expenses of Alliance and Faegre will be paid pursuant to the Debtor's budget attached to its Cash Collateral Motion.

28. I am the primary professional working on this matter and I will be working on the matter on a full time bases at the hourly rate of $350.00. Other professionals at Alliance who will be working on this matter will be:

| Professional | Hourly Rate | Extent of Services |
|---|---|---|
| Brock Kline | $275.00 | As needed |
| David Burke | $325.00 | As needed |
| Chris Tomas | $325.00 | As needed |
| Steve Murray | $350.00 | As needed |
| Jim Cullen | $350.00 | As needed |
| Michael Knight | $425.00 | As needed |

29. Each professional's hourly rates are subject to the normal and customary increases that occur each January. Alliance will provide copies of its invoices and Faegre's invoices to the Secured Lender, any committee appointed under Bankruptcy Code § 1103, any party requesting such invoices, and the United States Trustee on a monthly basis for notice purposes.

30. Alliance is well qualified to act as the Debtor's CRO. I hold an M.B.A. with honors from the University of Chicago Graduate School of Business, and am an active member of the Colorado Chapter of the Turnaround Management Association. I have over eight years' experience in working to assist financially troubled companies. In particular, I have been a consultant for a wide variety of businesses, performed interim CEO and CFO functions for small and middle market companies, and assisted large corporations with a variety of step-out/break-out business ventures. In these roles, I helped the companies establish capital structures and assisted with financial analysis and restructuring as necessary.

31. Alliance is a financial advisory firm that specializes in, among other things, turning around troubled businesses and marketing and selling such businesses and their assets. Alliance has 13 years' experience marketing the sales of businesses and assets via negotiated sales and auctions and has also participated in bankruptcy sales acting as marketers and auctioneers for commercial and industrial properties. Alliance has undertaken hundreds of turnarounds, divestitures, Article 9 sales, and reorganizations and has liquidated hundreds of millions of dollars worth of assets, both in and outside of bankruptcy.

32. Alliance's continued retention is absolutely essential to the continued operations of the Debtor's business, marketing of the Debtor's business as a going concern and the overall success of this bankruptcy case. Alliance has provided invaluable services to the Debtor by continuing the Debtor's operations at a critical juncture when all other officers and directors have resigned. Since August 9, 2011, Alliance has had authority to act as CRO of the Debtor, and since August 11, 2011, Alliance has overseen the daily business operations of the Debtor, analyzed the Debtor's commercial and contractual relationships and business, marketed the Debtor's business for sale as a going concern, begun discussions with several parties interested in purchasing the Debtor's business, and prepared the Debtor for the filing of its Chapter 11 case.

Alliance's services pre-petition provided the Debtor with a head start in analyzing its assets, selling its current inventory for maximum return, marketing its business for sale as a going concern, and formulating a plan that likely will provide creditors with a greater recovery.

33. The Debtor is not in default under the CRO Agreement and has provided adequate assurance of future performance to Alliance.

34. According to Alliance's books and records, Alliance received payments in the total amount of $95,532.95 from the receivership estate in connection with services it provided as receiver of the Debtor's assets under the Receivership Order. In addition, Alliance received $194,467.05 in a retainer from the receivership estate for its services as CRO of the Debtor, which Alliance still holds as security for services rendered. Concurrently with the filing of the Motion, Alliance is seeking approval of the retainer in accordance with applicable law and procedure.

35. In connection with the preparation of its retention as CRO, Alliance conducted an analysis to determine whether it holds or represents any interests adverse to the Debtor.

36. Except as disclosed herein, neither I nor any partner, associate, or employee of Alliance represents any entity in this case, nor has any connection with the Debtor, any creditor, or any other party in interest in this case, or their respective attorneys or accountants, or the United States Trustee or any person employed in the Office of the United States Trustee, nor represents any interest adverse to the creditors or the estate.

37. To the best of its ability in the circumstances, Alliance has conducted an examination, using the company's internal conflict checking procedures, of other actual and potential creditors and parties in interest to determine if Alliance has performed work for any of them in connection with this case or on other matters. Alliance has not discovered any actual or potential creditors or parties in interest that it performed work for in this or other cases, except that a) it acted as the Debtor's CRO pursuant to the Board Resolution; b) it acted as receiver of the Debtor's assets pursuant to the Receivership Order; and c) it was directly employed by the Secured Lender on a small unrelated matter earlier this year, as disclosed in the Involuntary Case.

38. The Debtor is not indebted to Alliance for any amounts as of the Petition Date.

39. Further, neither I nor any member of the Alliance engagement team serving the Debtor, to the best of my knowledge, is a holder of any of the Debtor's debt or equity securities.

**D.  Motion (I) For Turnover of Assets from Receiver to the Debtor in Possession, (II) For Issuance of Order Honoring Obligations of Receivership Estate, and (III) To Confirm Alliance Is the Responsible Officer of the Debtor**

40. As discussed above, the Debtor will seek within the first days of this case authority to continue the liquidation of its inventory in the ordinary course and also to establish procedures for the sale of its business within the first month or two of this case. For a smooth transition from a state court receivership to a debtor in possession, and to ensure procedural certainty, the Debtor must make certain that the receivership assets are properly turned over to

the Debtor, inventory sales may continue in accordance with prior practice, all of the receiver's obligations are honored, and there is a responsible officer in place with authority to make decisions on behalf of the Debtor.

*Turnover of Assets*

41.  The best interests of the estate are for Alliance to serve as the responsible officer of the Debtor pursuant to the broad authority granted to it under the Board Resolution instead of continuing to act as a receiver under the Receivership Order. However, other than Alliance, no other person or entity has the authority to make decisions on the Debtor's behalf.

42.  Accordingly, I believe it is in the best interests of the estate to have Alliance as receiver turn over all of the Debtor's property only upon entry of an order confirming Alliance's authority to act on behalf of the debtor-in-possession. I believe turnover in this fashion ensures that the property is not turned over to a debtor that is without management or executive authority and causes the least disruptions to the Debtor's business operations and its ability to sell its assets.

43.  If the Court does not recognize that Alliance has the full authority to act as the responsible officer of the debtor-in-possession, Alliance, as receiver, would turn over all the receivership property to a debtor without management. Therefore, if the Court denies this Motion, Alliance seeks excuse from turnover pursuant to Bankruptcy Code § 543(d) so that Alliance may continue with its management and sale of the Debtor's assets as the Debtor's receiver.

*Receivership Obligations*

44.  Alliance, as receiver, has managed the Debtor's operations to ensure minimal disruption to the Debtor's business and to market and sell the Debtor's assets prior to the Petition Date.

45.  For example, as part of its management of the Debtor's operations and pursuant to the Receivership Order, Alliance continued to abide by the Debtor's corporate policies regarding vacation and insurance benefits. Under these policies, the Debtor's employees accrue a certain number of paid vacation days and insurance benefits (including the payment of medical, dental, and life insurance payments), depending upon the number of years such employee is employed by the Debtor. As of the Petition Date, the receivership estate was obligated to pay the Debtor's current employees a total of $77,560.92 in accrued vacation amounts and $12,725.89 in insurance benefits (the "Employee Benefits").[2]

46.  Likewise, Alliance continued to direct the receivership estate to pay the Debtor's employees their current salaries and commissions. However, employees receiving sales commissions receive their sales commissions at the end of each month, and prior to the Petition Date employees were not pre-paid their commissions for September. Thus, as of the Petition

---

[2] These amounts do not include any amounts owed to terminated employees, as the receivership estate already paid terminated employees all outstanding vacation amounts pursuant to the Receivership Order.

Date, the receivership estate owed approximately $16,493.00 in accrued and unpaid sales commissions to the Debtor's employees (the "Employee Commissions").

47. Finally, I entered into several retention agreements ("Retention Agreements") with key employees of the Debtor to ensure that such employees remained with the company and assisted with a sale of the Debtor's inventory and other assets. The employees that are parties to the Retention Agreements are not officers or directors of the Debtor, but are essential to the ongoing success of the Debtor's operations through a sale. The Retention Agreements provide that the employees received an initial bonus if they were employed through September 23, 2011, and a second bonus if they are employed through the consummation of a sale. As of the Petition Date, the receivership estate is obligated to pay up to $55,000.00 upon the closing date of a sale of the remaining assets of the Debtor.

48. The Employee Commissions, Employee Benefits, and Retention Agreements were all proper exercises of my authority under the Receivership Order and, thus, constitute obligations of the receiver.

49. Further, it was reasonable for the receivership estate to become obligated to pay the Employee Commissions, Employee Benefits and enter into the Retention Agreements. Costs for the Employee Commissions, Employee Benefits and the Retention Agreements were approved by the Secured Lender, whose cash collateral was used pursuant to a budget under the Receivership Order. And the employees entitled to the Employee Commissions, Employee Benefits, and payments under the Retention Agreements are critical to the success of the Debtor and the sale of its assets.

50. The Employee Commissions are part of each employee's salary and were set prior to the receivership. Similarly, the Employee Benefits are paid pursuant to company policy. If I changed the salaries or changed the company's policy regarding benefits, the employees would have likely resigned.

51. Finally, the employees that executed the Retention Agreements are critical to the successful sale of the Debtor's assets and were very likely to leave immediately absent the commitments made under the Retention Agreements. Most of the employees had job opportunities elsewhere, and without these employees, the Debtor's ongoing business operations will suffer tremendously, with the going concern value of the Debtor decreasing accordingly.

*Alliance is the Responsible Officer of the Debtor*

52. The Board exercised its right to replace the management of the Debtor with a nominee of its choice—Alliance. The Board Resolution designated Alliance as a corporate officer and granted Alliance with "full and exclusive authority" to manage the corporation, "to commence a bankruptcy or other insolvency proceeding for the [Debtor] and to cause the [Debtor] to take any actions which the CRO deems necessary or appropriate in connection with such proceeding..." (Board Resolution at ¶2). Further, the major parties in this action, including the previous Board and the Secured Lender, all consent to the appointment of Alliance as the responsible officer in this bankruptcy proceeding.

  53. The recognition of Alliance as the responsible officer of the Debtor is necessary to enable this case to move forward so that the Debtor will be able to maximize the value of its assets for the benefit of the estate. The Debtor is currently seeking approval of a sale of its assets and business within a month or two after the Petition Date, and without a responsible officer entitled to act on behalf of the Debtor, the Debtor cannot properly operate the Debtor in the interim and then sell its assets.

E. **Expedited Motion for an Order Pursuant to 11 U.S.C. §§ 105(a) and 366 (I) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Utility Services, and (II) Approving the Debtor's Adequate Assurance of Payment to Utility Providers (the "<u>Utility Motion</u>")**

  54. In connection with the operation of its business, the Debtor receives utility service from the utility providers listed on Exhibit 1 to the Utility Motion (collectively, the "<u>Utility Providers</u>"), including providers of water, gas, electricity, telephone, and sewer service (collectively, the "<u>Utility Services</u>").

  55. Prior to the Petition Date, the Utility Providers provided Utility Services to the Debtor. Continuation of utility services is critical to the Debtor's continued operations and efforts to sell its business as a going concern within the first month or two of the case. In particular, the Debtor's inventory consists of beef that must be properly refrigerated or frozen at the Debtor's facilities. To that end, it is critical that within the first few days of the bankruptcy case this Court confirm the rights and obligations of the Utility Providers with respect to such adequate assurance of payment to avoid immediate and irreparable harm.

  56. The Debtor fully intends to pay all post-petition obligations owed to the Utility Providers in a timely manner and expects that it will have sufficient funds to pay its post-petition utility obligations.

  57. Additionally, the Debtor is providing each Utility Provider with a cash deposit in accordance with Exhibit 1 (each a "<u>Utility Deposit</u>"). The amount of each Utility Deposit represents an average one month of charge for services provided by the associated Utility Provider. To the extent a Utility Provider is holding a pre-petition deposit, the Debtor will pay an additional amount to the extent necessary to bring the total deposit up to the amount listed on Exhibit 1. The Utility Deposits will serve as cash security deposits to provide adequate assurance of payment for Utility Services provided to the Debtor after the Petition Date.

F. **Application to Employ Brownstein Hyatt Farber Schreck, LLP as Counsel for Debtor in Possession ("<u>BHFS</u>")**

  58. The Debtor has applied to employ BHFS as its bankruptcy counsel to perform on its behalf the following professional services:

   a. Assist in the production of the Debtor's schedules and statement of financial affairs and other pleadings necessary to file the Chapter 11 case;

  b. Assist in the preparation of motions and documents related to the sale of assets under § 363 of the Bankruptcy Code, if necessary;

  c. Assist in the preparation of the Debtor's plan of reorganization and the disclosure statement;

  d. Prepare on behalf of the Debtor all necessary applications, complaints, answers, motions, orders, reports, and other legal papers;

  e. Represent the Debtor in adversary proceedings and contested matters related to the Debtor's bankruptcy case;

  f. Provide legal advice with respect to the Debtor's rights, powers, obligations and duties as Chapter 11 debtor in the continuing operation of the Debtor's business and the administration of the estate; and

  g. Provide other legal services for the Debtor as necessary and appropriate for the administration of the Debtor's estate.

59. As noted throughout this Declaration, the Debtor has filed several first-day motions seeking expedited relief, all of which is critical for the Debtor to operate in the first weeks of this case and ultimately to sell its assets at the best and highest price. It is imperative that the Debtor have access to the services of BHFS as its counsel in obtaining these first-day motions and in assisting in a fast-moving Chapter 11 process in these first few weeks.

**G.** **Motion for (I) an Order Approving (a) Bid Procedures, (b) Notice of Sale, Auction, and Sale Hearing, (c) Assumption Procedures and Related Notices; and (II) an Order Approving the Sale of Substantially All of the Debtor's Assets (the "<u>Sale and Bid Procedures Motion</u>")**

60. Consistent with the authority granted to it under the Receivership Order and the Interim Orders, Alliance has endeavored, both prior to and since entry of the Receivership Order, to sell the Debtor's business as a going concern in order to maximize the value of the Debtor's assets and business operations for the benefit of its creditors. To that end, Alliance actively marketed the Debtor's assets to several potential purchasers. Specifically, Alliance, as receiver, has contacted over 250 potential purchasers and entered into approximately 30 non-disclosure agreements ("<u>NDAs</u>"). Of the parties that signed NDAs, 13 continue to pursue the opportunity to purchase the Debtor's assets, with more NDAs under review and in the process of being signed. Given the Debtor's current financial position and the seasonal nature of its business, I believe that a sale of all or substantially all of the Debtor's assets within the first month or two of this case is necessary in order to maximize value for the Debtor's estate and stakeholders.

61. Due to Alliance's marketing efforts, there were potential purchasers that expressed a preliminary interest in acquiring the Debtor's assets. Ultimately, however, the Debtor was unable to negotiate a stalking horse agreement prior to the Petition Date. Rather than delay the filing of this case, and because I believe that a sale occurring after the end of October may produce less interest for potential purchasers, I determined that it is in the best interests of

the estate to file the case and the Sale and Bid Procedures Motion without a stalking horse bidder and to open the sale to all interested parties, subject to certain procedures described below.

62. Particularly since the Involuntary Case was filed, I believe that an auction with or without a stalking horse bidder, if one is not identified prior to an auction of the Debtor's assets, provides the Debtor with the best alternative to maximize the value of the estate. I have already reached out to a significant pool of interested parties. If a sale of the Debtor's assets does not occur within the next one to two months, I do not believe that it will be able to obtain any additional interested parties, but I do believe the Debtor may lose the interest of some of the parties that have entered into NDAs. Thus, if the sale is delayed, I believe the Debtor will receive lower offers for its business or assets or only offers for some of its assets.

63. I believe that the proposed bidding procedures attached to the Sale and Bid Procedures Motion as Exhibit 1 (the "Bid Procedures") and the related auction constitute the best strategy for maximizing the value of the Debtor's business assets for the benefit of the various stakeholders.

64. I will continue to contact various parties who have previously expressed an interest in acquiring assets of the Debtor to determine whether such parties are interested in submitting a bid.

65. I anticipate that the only contracts that would be assumed by a potential purchaser, if any, will be the nonresidential real property leases for the Debtor's facilities in Denver and Nashville.

H. **Motion for Order Authorizing the Maintenance of Existing Bank Accounts and Authorizing the Continuation of the Centralized Cash Management System**

66. Prior to the Petition Date, I managed the Debtor's cash receipts and disbursements in the receivership from several bank accounts at Fifth Third Bank, US Bank and Regions Bank (collectively, the "Bank Accounts").

67. The Debtor's main operating account and lock box depository account (located at Fifth Third Bank) and the Debtor's cash depository account for its Colorado facility (located at U.S. Bank) are both held at authorized depositories approved by the U.S. Trustee. Although the cash depository account for the Nashville branch (located at Regions Bank) is not located at an authorized depository for the U.S. Trustee, it never exceeds a balance of $150,000.

68. If the Debtor is not permitted to maintain and utilize its current Bank Accounts, the Debtor would incur disruption in its ordinary financial affairs and business operations, delay in the administration of its estate, and additional costs to the estate to set up new systems, open new accounts, and print new checks.

69. The Debtor's main operating account has been under the direction and control of Alliance, as receiver, since August 11, 2011, and has been used during the pendency of the Involuntary Case, which was filed over one month ago. Prior to the Involuntary Case and in connection with the state court receivership, Alliance was required to transfer the funds in a previous banking account at Fifth Third Bank to a new receivership account at Fifth Third Bank.

This transfer was time consuming, and caused significant disruptions. It caused several checks to be dishonored, created payroll issues for critical employees, diverted attention away from the continued operations of the Debtor, and created concerns with vendors.

70. A repeat of these disruptions would be highly detrimental if repeated in this case, since the Debtor intends to focus its attention on finding a buyer for substantially all of its assets in the first days. Maintaining the status quo is critical to this case's success, and maintaining the existing Bank Accounts will preserve business continuity and avoid the monumental disruption and delay to the Debtor's payroll activity and daily business operations that would necessarily result from closing the Bank Accounts and opening new accounts.

71. Under the Debtor's cash management system, funds received from its customers are generally transferred to a lock box account at Fifth Third Bank (the "<u>Lock Box Account</u>"). All small cash deposits collected at the Debtor's Denver facility are deposited at US Bank and all small cash deposits collected at the Debtor's Nashville facility are deposited in an account at Regions Bank (collectively, the "<u>Cash Accounts</u>"). Generally, funds in the Cash Accounts are transferred to the Lock Box Account on a weekly basis, with a portion of the funds withdrawn for petty cash. Funds in the Lock Box Account are then swept on a daily basis to a receivership account at Fifth Third Bank, which account funds the Debtor's ongoing operations and is the account from which payroll and other expenses are paid.

72. These cash management procedures constitute ordinary, usual, and essential business practices. Further, they benefit the Debtor significantly, by controlling corporate funds centrally and ensuring availability of funds when necessary.

73. Requiring the Debtor to adopt a new, segmented cash management system at this early and critical stage of this case would be expensive, would create unnecessary administrative problems, and would likely be much more disruptive than productive.

DATED: September 24, 2011.

*s/Alex G. Smith*
Alex G. Smith